Filed 10/28/14  In re Angelina C. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANGELINA C., a Person Coming Under the Juvenile Court Law. | B253929 (Los Angeles County Super. Ct. No. DK00288) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSE C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Marilyn Kading Martinez, Juvenile Court Referee.  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Jose C. (father) appeals from the juvenile court's jurisdictional findings regarding his daughter Angelina C. (Angelina) (born in 2005). Father contends the jurisdictional findings were based solely on objected-to written hearsay in violation of Welfare and Institutions Code section 355[1] and that his right to due process was violated. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**Initial Referral**

The Los Angeles County Department of Children and Family Services (department) became involved with this family on April 8, 2013, following an anonymous referral that Angelina was the victim of emotional and sexual abuse and general neglect by father.[2] According to the referral, Angelina has been living with father in Bellflower, California for three years while her older brother Brian C. (Brian) lives in Yuma, Arizona with the children's mother, Gloria C. (mother). The parents are married but have been separated for five years.

The reporting party stated that Angelina slept in the same bed as father, that they slept in their underwear while father's penis was near her bottom, and that father bathed her. The reporting party once saw father lift Angelina off the ground while his pants were unzipped, and heard him tell Angelina she has "a butt like her mother." The reporting party was also concerned about father's anger. Father spanks Angelina on her bottom with both his hand and a belt, cursing at her, and telling her she is ugly. It was also reported that father harms and kills animals.

The department immediately interviewed Angelina and father, who both denied any wrongdoing. Father was willing to comply with the department's recommendations, including sleeping on the couch until he could obtain a bunk bed for Angelina.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Father believes the referral was made by his former girlfriend, H.C. (H.).

The department contacted mother in Arizona, who reported that she was 15 years old when she married father with her mother's permission. Father was 23 years old and was having sex at the same time with mother's 13-year-old sister. Mother thinks father might be a pedophile.

**Further Interviews**

The department's detention report detailed further interviews by the social worker.

**H.** has known father for three years and used to live with him and Angelina. Father has "intense anger outbursts about every three months." H. has seen father "blow up" at Angelina, and he will not allow H. to intervene on Angelina's behalf when he spanks the child with a belt. Father berates Angelina, calls her names, tells her that women are no good, and talks about his sexual encounters with women in front of Angelina. In addition to hitting Angelina, father has hit H., leaving bruises, then acting as if it is horseplay. Father told H. that he knows how to hit her without leaving bruises. H. is afraid of father. Father once found a kitten and put it in a cage with a ferret, who would hurt the kitten. When the kitten scratched Angelina, father told Angelina to kick it. H. took the kitten to a friend's house and father called the police, reporting that she stole his cat.

H. believes that father's relationship with Angelina "bordered on being sexually provocative." H. thinks father is a pedophile. She stated that father "will masturbate to anything" and told her that he "likes children who are just starting puberty." He buys bras for Angelina, who is not physically developed. Father once got angry at H. when she told him he should not sleep in the same room as Angelina and a friend during a sleepover. Father told H. to leave the house, and she went to the girls' parents and told them not to allow their daughter in father's home. Father also got upset at H. when she told him not to let Angelina walk around nude in the home. Father sleeps in his underwear, and H. has seen father "spoon" Angelina in bed. H. has also seen father and Angelina watch provocative Japanese anime cartoons while wearing only their underwear. Father washes Angelina's hair while she bathes. One time H. walked into the home unexpectedly and saw father pick up Angelina in the bedroom. H. asked him to

3

turn around and he refused; H. believed he had an erection or that his zipper was down. She believes father isolates himself with Angelina, encouraging her to be dependent on him. H. thinks father is "grooming Angelina so that he can sexually exploit her." At church, father likes to flirt with girls reaching puberty. H. heard father tell an 11-year-old autistic girl that she should have a boyfriend. H. warned the pastor about father.

**Mother** left father when she was 21. She was the victim of domestic violence by father during their marriage, stating "everything goes back to violence with him." Father yells at their son Brian a lot. When Brian was an infant, father told mother he thought it would be "'cool'" if Brian's first sexual experience was with mother. Father also told mother he did not see anything wrong with a grown man being with a little girl, which is acceptable in other cultures. Father was in the military and was married before mother. There was domestic violence in that relationship as well.

**Angelina** reported that father disciplines her by verbal warnings and spanks her one to two times a year. He has spanked her with a belt on her bottom. She denied that father yells or curses at her; she is not afraid of father. Father kisses her on the cheek, not the lips. She likes it when he hugs her tight. She sleeps in her underwear or clothes and father sleeps in his underwear. They have their own blankets. Sometimes father hugs her until she falls asleep while she has her back to him. She sits on father's lap while they watch television. She bathes herself, but father puts the conditioner on her hair. She denied that father sees her walking around the house naked.

**Father** admitted to being arrested 13 to 14 years ago for domestic violence against his first wife, Jessica C. (Jessica). He also described an incident with H., in which they were at the beach and she would not answer her cell phone when he called her from nearby. When he walked back to her, he spoke to her in a loud voice and bystanders called the police, who told him to calm down. Father admitted cursing at H. in front of Angelina. He also admitted sleeping in the same bed as Angelina while wearing only his underwear.

Father obtained a bunk bed for Angelina. Following his initial interview, he no longer walked around in his underwear. When the social worker suggested that father

4

participate in therapy and parenting education, he declined and said he was willing to take his chances in court.

**The Petition**

On August 5, 2013, the department filed a petition on behalf of Angelina and Brian.[3] As amended, the petition alleged under paragraph b-1: "Father . . . has a history and pattern of problems with anger management. Given this history and his pattern and denial, Angelina is placed at risk of harm." Under paragraph b-2, the petition alleged: "Angelina's father . . . has a history of interest and sexual involvement with underage girls while he was an adult. And now, as a father, he has exercised poor judgment in failing to recognize appropriate boundaries between himself and his daughter such that Angelina is placed at risk of harm."

**Detention Hearing**

Father and mother were both present at the detention hearing and were appointed counsel. The juvenile court declared father to be the presumed father, and ordered Angelina to remain with father and Brian to remain with mother, and that family maintenance services be provided.

**Jurisdiction and Disposition Report**

A dependency investigator (DI) conducted further interviews:

**Angelina** stated that she liked living with father because he pays her attention and mother works all the time. She reported that father spanked her with a belt on her bottom and that he spanked her "really hard to teach [her] a lesson."

**Mother** reported that father lost his temper "really bad" when they were first married and neighbors called the police a couple of times. She stated that father "would just become violent all the time," throw things, and mother would hide in the bathroom. Father would sometimes come to her work and yell at her, until her boss threatened to call father's supervisor. Mother wanted father to get counseling, but he refused. The day they separated, father raped mother and she became pregnant with Angelina. Father's

---

[3]     The petition was later dismissed against Brian.

first wife Jessica told mother that father used to beat her and she had to be taken to the hospital. Father told mother that it was acceptable in other cultures for young girls to be sexually initiated by older men. Mother stated, "He's really into sexual things, and he likes little girls or women who look like little girls. I'm pretty sure he does like little girls." Mother expressed concern that father would think about Angelina in a sexual way. Father watched pornography while he and mother were living together, and Jessica told mother he watched pornography during their marriage as well. Mother said that father used to flirt with a female relative who was about 12 or 13 years old until her parents stopped bringing her by the house.

**Father** admitted leaving H. a voicemail after repeatedly asking her to return the cat in which he said, "I'm going to go after your family and your dogs if I have to." He explained to the DI that he meant he would take legal action and denied that it was a threat. Father denied domestic violence with both mother and Jessica. Father admitted that some of the anime cartoons he watched with Angelina contained frontal nudity in bathhouses, but he did not see anything wrong with it because it was not sexual in nature. Father kept pornographic videos on a high closet shelf and said he would be willing to get rid of them. Father admitted he had sexual relations with mother's sister, but claimed that the sister was around 17 years old at the time. Father admitted that he had posted pictures of himself and Angelina on dating websites. Father does not believe in therapy and said he had no friends or support system. He often experiences memory loss.

**H.** reported that father has never seen his first son and does not spend much time with Brian, focusing instead on Angelina. H. stated that both Angelina and Brian know that father slept with mother's sister, whom he talks about a lot.

**Subsequent Information**

When a new social worker assigned to the case contacted father, he repeatedly stated that he did not trust the department. The department subsequently reported that father remained uncooperative with and hostile toward the department, refusing to allow the department access to his home. The principal at Angelina's school reported that during a back-to-school meeting when the teacher was making recommendations for

healthy snacks, "father became upset and told the teacher that the school could not tell him what to feed his child." Only one other parent out of 642 students reacted similarly to father.

The DI interviewed father's brother, who stated that he respected father, but family members had a problem with father always wanting to hold and play with children.

Father had not taken Angelina to any medical or dental appointments in five years. Per the juvenile court's order, he took her to the dentist; she had six cavities and needed a root canal.

**Yuma Police Department Report**

The department submitted a report by the Yuma Police Department, which stated that in 1998, father was arrested for domestic violence against his first wife Jessica. Father confirmed Jessica's allegations to the police, telling the responding officer that they had argued about money, he "got mad" at her, "grabbed" her and pulled her out of bed, picked her up and tried to push her out of the apartment. Father stated he knew he had a bad temper, but he could only take so much. Jessica did not report the incident sooner because the Yuma police had been to their home before for domestic disturbance and she was afraid that their son would be taken away.

**Jurisdiction and Disposition Hearing**

The jurisdiction and disposition hearing was held on January 17, 2014. Prior to the hearing, father submitted written objections to hearsay statements made by H. in any reports. At the hearing, the juvenile court stated that the hearsay statements "will not and cannot be the sole basis for the jurisdictional decision." Father's attorney stated at the hearing that she also wanted to "include statements attributed to Jessica [C.] [in the Yuma Police Department report] in my [section] 355 objection at this time." The court ruled that the report was "fully admitted." Following closing argument, the court sustained the petition as amended. As to disposition, the court ordered that Angelina remain with father and that family maintenance services be provided, including individual therapy for

Angelina and individual counseling for father to address anger management and setting appropriate boundaries. This appeal followed.

## DISCUSSION

### I. Hearsay and Substantial Evidence

Father contends the juvenile court violated section 355 by relying solely on the objected-to hearsay of H. and Jessica to support the jurisdictional findings under section 300, subdivision (b).[4]

### A. *Section 355*

Section 355, subdivision (b) provides that "A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, . . . ." However, if "any party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes one or more" enumerated exceptions: (A) The hearsay evidence would be admissible in any civil or criminal proceeding; (B) The hearsay declarant is under 12 years of age and is the subject of the jurisdictional hearing; (C) The hearsay declarant is a peace officer, health practitioner, social worker, or teacher; or (D) the hearsay declarant is available for cross-examination. (§ 355, subds. (c)(1)(A)–D).)

"Section 355 thus does not bar hearsay evidence at a jurisdictional hearing but, if a timely objection is made and no hearsay exception applies, the evidence must be corroborated." (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1280.) "Corroborating evidence is evidence which supports a logical and reasonable inference that the act described in the hearsay statement occurred. [Citation.] The quantum of corroboration

---

[4]     Section 300, subdivision (b) provides in part that a child comes within the jurisdiction of the court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . ."

necessary to support a jurisdictional finding is 'somewhat analogous to the rule in criminal law requiring independent corroborative proof of accomplice testimony,' that is, direct or circumstantial evidence, even if slight, is sufficient if it tends to connect the accused with the act." (*Id.* at pp. 1280–1281.)

### B. Anger Management Finding

In sustaining paragraph b-1 of the amended petition, the juvenile court made the finding that father "has a history and pattern of problems with anger management," which, along with his denial of such, places Angelina at risk of harm. Father's argument that the juvenile court erred by relying solely on Jessica's hearsay statements about domestic violence in the Yuma Police Department report to support this finding is without merit.

First, the record does not indicate that the juvenile court relied solely on Jessica's statements. Indeed, the court specifically stated that it could not rely entirely on these statements. Second, the statements were corroborated. As stated in the report, father, himself, told the responding officer that he and Jessica had argued about money, father "got mad" at her, "grabbed" her and "pulled" her out of bed, picked her up and tried to push her out of the apartment. Father also stated that he knew he had a bad temper, but he could only take so much. Father also told the department's social worker that he had been arrested for domestic violence against Jessica, though he later implausibly denied it. "Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

In any event, the record contains additional substantial evidence to support the court's jurisdictional finding in paragraph b-1 that father has a history and pattern of problems with anger management. Mother told the department's social worker that she was the victim of domestic violence by father during their marriage. She told the DI that father lost his temper "really bad" when they were married and neighbors called the police more than once. Mother stated that father "would just become violent all the time." Mother also reported that Jessica stated to her that father used to beat Jessica up to

9

the point of having to be taken to the hospital. Father raped mother when she was leaving him, resulting in her becoming pregnant with Angelina.

H. reported that father has angry outbursts every few months and she has seen him "blow up" at Angelina, berate her and call her names. He has spanked Angelina with a belt on her bottom and will not let H. intervene. Father has also hit H., then acts as if it is horseplay. H. reported being afraid of father.

Angelina confirmed that father spanked her on her bottom with a belt. She also reported that he spanked her "really hard" to teach her a lesson.

Father's own admissions demonstrated his ongoing anger issues. He described the incident with H. in which he yelled at her at the beach for not answering her cell phone when he called and the police told him to calm down. He admitted leaving H. a voicemail in which he threatened to go after her family and her dogs for taking his kitten. He also admitted cursing at H. in front of Angelina. Additionally, the department reported that father demonstrated hostility toward the newest social worker assigned to the case. And the principal of Angelina's school reported that father became upset when Angelina's teacher talked about proper nutrition.

The juvenile court properly found that father's anger management issues placed Angelina at risk of serious physical harm.

### C. Inappropriate Boundaries Finding

In sustaining paragraph b-2 of the amended petition, the juvenile court made the finding that father "has a history of interest and sexual involvement with underage girls while he was an adult" and that "now, as a father, he has exercised poor judgment in failing to recognize appropriate boundaries between himself and his daughter such that Angelina is placed at risk of harm." Father's argument that the juvenile court erred in relying solely on H.'s objected-to hearsay to support this finding is without merit.

H.'s statements in the department's reports were corroborated. H. stated that father's and Angelina's relationship bordered on being sexually provocative. Both father and Angelina confirmed that they slept in the same bed wearing only underwear. H. reported seeing father "spoon[ing]" Angelina. Angelina confirmed that father hugged her

10

almost every night until she fell asleep and that her back was to father when he hugged her. Angelina also confirmed H.'s statement that Angelina sat on father's lap while watching television. H. reported that father and Angelina watched sexually provocative cartoons together. Father confirmed that some of the cartoons contained frontal nudity in bathhouses. H. also reported that father told her he likes children who are just starting puberty, and that father flirted with a young autistic girl at church. Given the young ages of mother and the maternal aunt when father was sexually involved with them (which he does not deny), this hearsay statement was corroborated. H. thought father might be a pedophile. Mother also reported she believed father was a pedophile.

Again, the record contains additional substantial evidence that father has a history of interest and sexual involvement with underage girls and that he has exercised poor judgment in failing to set appropriate boundaries between himself and Angelina. Mother reported that father told her he did not see anything wrong with a grown man being with a little girl or sexually initiating her. Mother reported that father used to flirt with his 12 or 13-year-old relative until they stopped coming by the house. Mother also reported that father watched pornographic videos while they were married. Father admitted that he kept pornographic videos in the home he shared with Angelina. Mother reported being concerned that father had sexual thoughts about Angelina. And the paternal uncle reported that some members of father's family had a problem with father always wanting to hold and play with children.

That father had modified some of his conduct prior to the jurisdiction and disposition hearing, such as getting a separate bed for Angelina and not walking around the house in his underwear, did not mean the juvenile court had to ignore father's long history of prurient and bizarre behavior with respect to young girls. The court could reasonably conclude that the changes father had made since the filing of the dependency petition were merely the result of the court's and the department's involvement and did not demonstrate that father had truly changed his nature. The juvenile court properly found that Angelina remained at risk of serious physical harm and required the supervision of the court.

**II.  Dental Neglect**

Finally, father argues that the juvenile court violated his right to due process by making a factual finding of dental neglect when no such allegation was pled in the petition.  But the juvenile court did not make a factual or jurisdictional finding of dental neglect.  The court stated:  "I don't know where the neglect and the dental decay comes in because I'm not sustaining neglect, but this clearly requires court supervision because it wasn't until the court became involved that Angelina was finally taken to a dentist, and her dental decay was so bad, being eight years old, she required [a] root canal."  Father's argument is therefore without merit.

## DISPOSITION

The juvenile court's jurisdiction and disposition order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
                    ASHMANN-GERST


We concur:


_____,J.
            CHAVEZ


_____, J.
            HOFFSTADT


12